## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARTIN RAMIREZ** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.    16-5021** |
| | : | |
| **PALMER TOWNSHIP, et al.** | : | |

## MEMORANDUM OPINION

**SCHMEHL, J.  /s/ JLS**                                      **February 26, 2018**


         Plaintiff brought this action under Title VII of the Civil Rights Act of 1964

and the Pennsylvania Human Relations Act, claiming that defendant Palmer Township's

decision not to retain Plaintiff as a police officer past his one-year probationary period

was based on his race and national origin. Plaintiff has also asserted claims against

Palmer Township under Title VII and the PHRA for retaliation, hostile work environment

and negligence. In addition, Plaintiff claims all defendants discriminated against him on

the basis of his race in violation 42 U.S.C. § 1981. Plaintiff has also asserted a claim

under 42 U.S.C. § 1983, alleging all the defendants violated the First, Fifth and

Fourteenth Amendments by terminating his employment without due process of law.

Finally, Plaintiff claims the individual defendants aided and abetted discrimination and

retaliation under the PHRA.  Presently before the Court is defendants' motion for

summary judgment. For the reasons that follow, the motion is granted.

        Summary judgment is appropriate if there is no genuine dispute as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere

existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

The following facts are not disputed or construed in the light most favorable to Plaintiff:

1. Plaintiff was born in the Dominican Republic. (ECF 19-2, p. 38.)

2. Plaintiff's first language is Spanish.  (ECF 19-2, p. 38.)

3. When Plaintiff moved to the United States in 1984, he did not speak any English. (ECF 19-2, p. 39.)

4. When Plaintiff moved to the United States, he took classes in English as a second language for over two years. (ECF 19-2, p. 39.) Plaintiff testified that

these classes only taught him the basics of how to communicate, not formal English grammar. (ECF 19-2, p. 40.)

5.  When Plaintiff later attended technical school in New York, he took classes in formal English grammar. (ECF-2, pp. 41-42.)

6.  Plaintiff described those classes as "a real struggle," and testified, "I guess at that point, I couldn't get it together in school grammatically." (ECF 19-2, p. 42.)

7.  Plaintiff took about five (5) classes in formal English grammar, but did not pass all of them. (ECF 19-2, p. 43.)

8.  None of these classes addressed the subject of English writing. (ECF 19-2, p. 43.)

9.  Plaintiff testified that he still needs to take classes in English writing and grammar, because he could use improvement in those areas. (ECF 19-2, p. 69.)

10. By letter dated October 25, 2013, Plaintiff was notified by Palmer Township Manager Christopher Christman ("Christman") that he was being hired as Probationary Police Officer for a term of one-year, with his effective date of employment beginning on November 11, 2013. (ECF 19-3.)

11. Plaintiff understood that, as a Probationary Police Officer, "you are going to have a year to prove yourself and then after that year, you may continue with your job." (ECF 19-2, p. 85.)

12. Plaintiff understood that the position at Palmer Township was not a civil service position.  (ECF 19-2, p. 57.)

13. Plaintiff testified that he understood that this meant that Palmer Township could select who they wanted to bring in to interview. (ECF 19-2, p. 57.)

14. Plaintiff testified that at the time Plaintiff was hired, Defendant Palmer Township Police Chief Louis Palmer ("Chief Palmer") knew that Plaintiff was Hispanic, had emigrated from the Dominican Republic, and spoke with an accent. (ECF 19-2, p. 87.)

15. In fact, when Plaintiff came in for his interview at Palmer Township, he assisted in translating in Spanish for someone who was waiting in the lobby. (ECF 19-2, p. 82.)

16. Several people at Palmer Township, including Chief Palmer, Lieutenant Wayne Smith, Sergeant Timothy Ruoff, and Officers Christopher Watt, Brent Lear, Jeffrey Karp, and Kenneth McPherson, told Plaintiff that his bilingual skills were an asset to the Palmer Township Police Department. (ECF 19-2, p. 106-107.)

17. Plaintiff believes that Chief Palmer hired him because Plaintiff's bilingual skills were an asset to the Palmer Township Police Department. (ECF 19-2, p. 108.)

18. Plaintiff's employment at Palmer Township was his first job as a municipal police officer. (ECF 19-2, p. 86.)

19. Officer Christopher Watt, a Caucasian, who was hired at the same time as Plaintiff as a probationary police officer, already had eight to ten (8-10) years of experience as a municipal police officer in another state. (ECF 19-2, p. 86.)

20. After they were hired, Plaintiff and Officer Watt both spent several weeks reading department policies and procedures. (ECF 19-2, p. 87-88.)

21. After those few weeks, Plaintiff and Officer Watt began field training. (ECF 19 2, pp. 89-90.)

22. Defendant Sergeant Michael Vangelo reviewed and signed-off on every Field Training Daily Observation Report ("FTO"). (ECF 19-4, p. 45.)

23. On December 4, 2013, Officer Jeremiah Santo rated Plaintiff a "2" (below standards) for knowledge of ordinances and for radio articulation. Officer Santo also noted that Plaintiff needed to pay closer attention to the numbers of addresses, as Plaintiff "forgot or provided a wrong numeric to a house." (ECF 19-5.)

24. On January 1, 2014, Officer Santo noted that Plaintiff "drives to *[sic]* fast to non priority calls." (ECF 19-6.)

25. On the same day, Officer John Smoke noted that Plaintiff "exceeds expectations of roads-sides/main" but that he "must be more observant of side street stop signs." (ECF 19-7.)

26. On January 9, 2014, Officer Steven Steckel noted that Plaintiff "needs to be re-trained in firearm safety," including the police shotgun. Officer Steckel wrote, "I asked if he was shown to properly load and unload the shotgun, he stated yes, but needs to do it more often." (ECF 19-8.)

27. In light of this concern, Sergeant Vangelo requested that Lieutenant (then Sergeant) Wayne Smith provide this additional training. (ECF 19-9.)

28. Officer Steckel also noted that Plaintiff "[n]eeds more work on report writing" and "driving speed changes stops where there are no stop signs and stops at green lights fails to use turns signals." (ECF 19-8.)

29. The additional firearm training was provided to Plaintiff on January 20, 2014. (ECF 19-10.)

30. Sergeant Wayne Smith noted that Plaintiff properly handled the police shotgun and rifle without issue. (ECF 19-10.)

31. On January 20, 2014, Officer Steckel noted again that Plaintiff "[n]eeds more work on report writing." (ECF 19-11.)

32. On January 23, 2014, Officer Steckel reported that Plaintiff "[n]eeds to improve on report writing," and "[n]eeds to go over the [AR-15] with Sgt. Smith again." Steckel did note that Plaintiff "did well handling the calls, spoke with complainants, gained all info for the report, found his way to the calls without a map." (ECF 19-12.)

33. On January 28, 2014, Officer Steckel noted that Plaintiff's "[r]eport writing needs work." (ECF 19-13.)

34. Officer Steckel also noted that Plaintiff was able to speak to an individual in Spanish, which helped in a certain incident. (ECF 19-13.)

35. On January 29, 2014, Officer Steckel reported that Plaintiff "[s]till needs work on reports." (ECF 19-14.)

36. On February 3, 2014, Officer Steckel reported that Plaintiff "[s]till needs work on reports." (ECF 19-15.)

37. On February 12, 2014, Officer Steckel reported that Plaintiff "[s]till needs work on the reports putting all info into the report from the information that was given to him. Needs to read over his reports before sending it [sic] to the sgt." (ECF 19-16.)

38. In light of the issues identified by the Field Training Officers, a decision was made to extend Plaintiff's Field Training for an additional two to four (2-4) weeks. (ECF 19-16.)

39. On February 16, 2014, Officer Steckel noted that Plaintiff "needs to write down the address, may have gone to wrong address if I didn't advise." (ECF 19-17.)

40. In that report, Officer Steckel also noted, "Martin was given back a few reports from Sgt. Nelson to correct and send back. Martin needs to slow down with the reports. Several corrections are needed."  (ECF 19-17.)

41. On February 28, 2014, Officer Jeffrey Karp noted, "Drove to domestic with lights siren activated. Stopped for red lights + stop signs, paying close attention to other traffic on the roadway." (ECF 19-18.)

42. Plaintiff admits that, during Field Training, Sergeant Vangelo spoke with him about needing to work on his report writing. (ECF 19-2, p. 112,)

43. Plaintiff testified that he did not believe that anyone from Palmer Township discriminated against him during his Field Training.  (ECF 19-2, p. 126.)

44. On March 5, 2014, Plaintiff was assigned to Sergeant Timothy Smith's platoon. (ECF 19-2, p. 126.)

45. According to Plaintiff, on March 5, 2014, Sergeant Smith called him to a supermarket parking lot and told him, "Listen, I don't know you. I want to know what you can offer. You know, you never been - you never worked as police officer" and "Well, I am going to have a three-strikes rule for you. You mess up the three strikes, you out." (ECF 19-2, pp. 133-134.)

46. Plaintiff testified that he does not know whether this statement had anything to do with his race or national origin. (ECF 19-2, pp. 159-160.)

47. Plaintiff testified that he believes that he made three (3) mistakes in March 2014, but was not terminated. (ECF 19-2, pp. 135-136.)

48. Most of the problems that Plaintiff had with Sergeant Smith related to writing reports. (ECF 19-2, p.161.)

49. When Plaintiff started on Sergeant Smith's platoon, Sergeant Smith had only recently been promoted to his position. (ECF 19-2, p. 139.)

50. Plaintiff testified that there is nothing wrong with a new ranking officer such as Sergeant Smith wanting to make sure that a rookie police officer did things his way and that his reports were done correctly. (ECF 19-2, pp. 139-140.)

51. Sergeant Vangelo testified that "rookie" police officers are not supposed to be subjected to hazing, abusive or humiliating treatment, and are supposed to be subject to the same standards of conduct as any other police officer. (ECF 21-8, pp. 106-107.)

52. Plaintiff never received any formal discipline for his report writing. (ECF 19-2, pp. 175-176.)

53. Plaintiff also testified that, on two or three (2-3) occasions, Sergeant Smith made fun of his Spanish accent and pronunciation when Smith was talking to the platoon. (ECF 19-2, pp. 214-216.)

54. Plaintiff admits that he has a thick accent. (ECF 19-2, p. 217.)

55. Plaintiff also testified that Sergeant Smith criticized him for allegedly not speaking clearly over the police radio. (ECF 19-2, p. 231.)

56. Plaintiff asked other officers in his platoon whether he was intelligible over the radio, and they informed him "Yeah. No problem. You are fine." (ECF 19-2, pp. 233-234.)

57. Plaintiff testified that he understood that it was important that other officers be able to understand him when he spoke on the radio. (ECF 19-2, p. 232.)

58. Plaintiff was never disciplined for failing to speak clearly over the radio. (ECF 19-2, p. 234.)

59. On May 12, 2014, Plaintiff was issued a verbal warning by Sergeant Timothy Smith for safety violations at the firing range and for failing to follow instructions at the firing range. (ECF 19-19.)

60. Specifically, Plaintiff was charged that he: 1) tried to catch a round that he was ordered to eject from his handgun, which led to the muzzle of the firearm not being pointed down range; and 2) failed to follow instructions with regard to the part of the target he was instructed to shoot. (ECF 19-20.)

61. On May 13, 2014, Plaintiff was issued written warnings by Sergeant Timothy Smith and Officer John Gillen for additional incidents that occurred at the firing range. (ECF 19-21.)

62. Sergeant Smith charged Plaintiff with being late to the firing range and with improperly shooting Sergeant Smith with an airsoft rifle after being told to stand down. (ECF 19-21.)

63. On May 14, 2014, Plaintiff was issued a verbal warning by Sergeant Timothy Ruoff for failing to comply with directions regarding preparing packages for the District Attorney's Office. (ECF 19-22.)

64. Issues also arose between Plaintiff and Sergeant Glenn Sipel regarding the preparation of crash reports. (ECF 19-19-2, pp. 203-204.)

65. In light of these warnings, Plaintiff was advised that an Administrative Inquiry was being conducted. (ECF 19-23.)

66. Sergeant Vangelo conducted the investigation into the issues with Plaintiff. (ECF 19-4, p. 16.)

67. A *Loudermill* hearing was scheduled for June 6, 2014. (ECF 19-2, p. 197; ECF 19-24.)

68. Plaintiff testified that he had been properly notified of all the claims against him and had been given the opportunity to provide a written response to the allegations against him. (ECF 19-2. p. 197.)

69. In response to the charge that he improperly tried to catch the round ejected from his firearm, Plaintiff wrote, "I did empty the live round but I should have left it fall in the floor instead I caught it with my hand." (ECF 19-2, pp. 198-199; ECF 19-25.)

70. In response to the charge that Plaintiff fired at the wrong areas of the target, Plaintiff wrote, "I wanted to accumulate the easy points first hitting the target center mass but at the same time I did not follow the instruction as it was told." (ECF 19-2, p. 200; ECF 19-25.)

71. In response to the charge that he was late to the firing range, Plaintiff wrote, "I did report at 0814 hours, which the class was delayed for 14 minutes." (ECF 19-2, p. 201; ECF 19-25.)

72. In response to the charge that Plaintiff shot Sergeant Smith with an airsoft rifle, Plaintiff wrote, "During the second phase of this scenario, Sgt. Smith was waiting for me to turn around the corner. Once I turned around the corner, it is to my believe [sic] that Sgt. Smith opened fire first using a simulated pellet gun in which I returned fire back at him using my simulated pellets gun as well." (ECF 19-2, pp. 201-203; ECF 19-25.)

73. Plaintiff never made any mention that Officer Gillen failed to tell him to stand down until his deposition on April 12, 2017. (ECF 19-2, p. 203.)

74. In response to charges that he made errors on state crash reports, Plaintiff wrote, "I am doing my due diligence in correcting those reports in a more satisfactory way to please Sgt. Sipel. I hope not to have those issues in the future, I will have better reports." (ECF 19-2, pp. 203-204; ECF 19-25.)

75. In conclusion, Plaintiff wrote, in part, "1. I did not follow the directions given to me at the range during 5/12 and 5/13/14. I don't know if I was too nervous to qualify but it won't happen again. 2. I do believe that Sgt. Sipel has a valid point concerning the state crash on the computer. I will get better at this." (ECF 19-2, pp. 206-207; ECF 19-25.)

76. In his response to the administrative charges against him, Plaintiff did not make any complaint that Sergeant Smith was being unfair to him or discriminating against him. (ECF 19-2, pp. 207-208; ECF 19-25.)

77. In his response to the administrative charges against him, the only fact that Plaintiff disputed was whether he or Sergeant Smith shot first. (ECF 19-2. P. 208; ECF 19-25.)

78. As a result of the investigation conducted by Sergeant Vangelo, Plaintiff received a written warning. (ECF 19-2, p. 209.)

79. This was the only formal, written discipline Plaintiff received during his employment with Palmer Township. (ECF 19-2, p. 210.)

80. Plaintiff was not suspended as a result of the written warning. (ECF 19-2, p. 209.)

81. Plaintiff's hours were not cut as a result of that written warning. (ECF 19-2, p. 209.)

82. Prior to receiving the written warning, Plaintiff had never made any complaint about being the victim of about racial or national origin discrimination. (ECF 19-2, p. 211.)

83. When Plaintiff was given the written warning, he was told that his performance would be reassessed in sixty (60) days. (ECF 19-2, p. 240.)

84. During those sixty (60) days, Plaintiff did not request any additional training. (ECF 19-2, p. 241.)

85. Plaintiff testified that he understood that, if his performance did not improve by the end of the probationary period, he might not be retained. (ECF 19-2, p. 241.)

86. On July 3, 2014, Plaintiff responded to a domestic incident. (ECF 19-2, p. 143; ECF 19-26.)

87. During that incident, a man threatened to set a car on fire that he had given to his girlfriend. (ECF 19-2, p. 144.)

88. Sergeant Timothy Smith specifically ordered Plaintiff to remain with and monitor the female involved in the incident. (ECF 19-2, p. 144.)

89. When the female exited the house, Plaintiff followed the female. This allowed the male in the house to close and lock the door of the house which had not been cleared for weapons. Smith criticized Plaintiff for failing to keep his foot in the doorway. (ECF 19-2, pp. 145-146.)

90. Plaintiff testified that he was not disciplined at the time for his involvement in that incident. (ECF 19-2, p. 150.)

91. On September 1, 2014, Plaintiff was informed by a bystander that a man in a red Mercedes Benz pointed a gun at someone. (ECF 19-2, p. 154; ECF 19-27.)

92. Plaintiff drove away, looking for the red Mercedes Benz. (ECF 19-2, p. 155.)

93. Plaintiff did not call for backup or put out a call over the radio that he was pursuing a man with a gun. (ECF-19-2, p. 157.)

94. Plaintiff admitted he made mistakes with regard to this incident and that these mistakes could have been fatal to him. (ECF 19-2, p. 158.)

95. With regard to the attention that Sergeant Smith paid to Plaintiff's reports, Plaintiff admitted that he was the only officer on his platoon who was really new to the job. (ECF 19-2, pp. 165-166.)

96. Plaintiff admits that this extra attention could have been because he was a rookie or because he had been counseled several times during field training with regard to his report writing. (ECF 21-6, p. 166.)

97. Plaintiff testified that Smith made his written corrections to Plaintiff's reports in a demeaning manner. (ECF 21-6, p. 168.)

98. Plaintiff testified that even when he had other officers in his platoon write his reports, Smith would criticize the reports even though the officers seldom received any criticisms of their own reports. (ECF 21-6, pp. 161-162.)

99. On or about July 7, 2014, Plaintiff tried to submit a letter of resignation. (ECF 19-2, p. 248; ECF 19-28.)

100. Plaintiff went into Sergeant Vangelo's office and read him the letter. (ECF 19-2, pp. 253-254.)

101. Plaintiff then met with Chief Palmer and read the letter to him. (ECF 19-2, pp. 256-257.)

102. After reading the letter, Chief Palmer told Plaintiff that he would try to move him to another platoon. (ECF 19-2, pp. 256-257.)

103. Plaintiff does not recall discussing anything else with Sergeant Vangelo or Chief Palmer during those meetings. (ECF 19-2, p. 257.)

104. Plaintiff did not submit the letter of resignation that he had drafted. (ECF 19-2, p. 257.)

105. Other than what was written in the letter, Plaintiff did not make any complaints about Sergeant Smith during his employment with Palmer Township. (ECF 19-2, p. 259.)

106. In his letter of resignation, Plaintiff did not include any reference to his race or national origin, but basically accused Sergeant Smith of constantly yelling at him and humiliating him. (ECF 19-28.)

107. Specifically, Plaintiff wrote that Sergeant Smith "humiliate[s] and cannot stop the process of humiliation until I am gone for good;" "There is a difference between being a Drill Sgt and a humiliating Sgt;" "Everybody in the platoon I work in feels ashamed to see Sgt. Smith talking and treating me in the way he is customary to do so." (ECF 19-28.)

108. The Court notes that the letter is riddled with misspellings and cross outs. (ECF 19-28.)

109. About two (2) weeks after Plaintiff tried to submit his letter of resignation, Chief Palmer informed him that he would not be able to move Plaintiff to another platoon. (ECF 19 -2, pp. 257-258.)

110. Chief Palmer and Sergeant Vangelo both expressed to Plaintiff that they wanted Plaintiff to stay with Palmer Township. (ECF 19-2, pp. 258-259.)

111. Plaintiff issued a citation to a motorist for entering an intersection on a yellow light, and was later told by Sergeant Vangelo he should not have issued the citation. Vangelo offered to void the ticket. (ECF 19-2, pp. 248-249.) Plaintiff testified that he had not read the part of the motor vehicle code relating to proceeding on a steady yellow signal. (ECF 19-2, pp. 246-247.) Sergeant Vangelo explained the operation of the rule to Plaintiff. (ECF 19-2, p. 246-247.)

112. On September 2, 2014, Plaintiff met with Lieutenant Wayne Smith and Officer Tyson Unangst to discuss his driving. (ECF 19-2, p. 261.)

113. Lieutenant Smith and Officer Unangst spoke with Plaintiff about him driving too fast on a particular call to a McDonald's.

114. Lieutenant Smith documented the September 2, 2014, meeting with Plaintiff. Lieutenant Smith noted that "I became concerned during this discussion of Ramirez's inability to completely think through processes of placing himself or his fellow officers in harm's way, and his inability to understand the ramifications of his lack of thought." (ECF 19-32.)

115. Chief Palmer testified that he viewed two (2) videos of Plaintiff's driving. (ECF 19-30, p. 53.)

116. With regard to the video in which Plaintiff drove past the McDonald's to which he had been dispatched, Chief Palmer testified that he was concerned about the speed at which Plaintiff was driving. (ECF 19-30, p. 54.)

117. With regard to the video in which Plaintiff was trying to respond to a domestic call, Chief Palmer testified that this video "scared the bejesus" out of him. (ECF 19-30, pp. 55-56.)

118. Chief Palmer testified that he observed in the second video Plaintiff running through stop signs without slowing down and running at least one red light at a major intersection. (ECF 19-30, p. 54.)

119. The Court has viewed these videos. The second video does indeed show that Plaintiff running through several stop signs (without even slowing down) and a red light (without stopping), and that Plaintiff nearly struck a car head-on. (ECF 19-31.)

120. Chief Palmer testified that he was concerned because he recalled an incident in which a City of Allentown Police Officer with a bad driving history struck and killed a four (4) year old child. (ECF 19-30, p. 68.)

121.    On October 15, 2014, Sergeant Timothy Smith sent an email to Chief

Palmer, the Lieutenants, and the Sergeants congratulating Plaintiff for getting

his first "DU"I from a traffic stop.(ECF 19-33.)

122.    On Halloween night, October 31, 2014, written voluntary statements were

made against Plaintiff by Officer Steven Steckel and his brother, Bob Steckel,

for the Plaintiff's conduct that evening. (ECF 19-2, p. 264.)

123.     According to the written complaint made by Bob Steckel:

> I was trick-or-treating with my niece in Wilden Acres. I
> noticed a car approaching at a fast rate of speed. A person,
> walking nearby, screamed at the driver. The car stopped
> quickly. The pedestrian apologized to the driver. The car left
> the area quickly and sped past us. At that point, I recognized
> that it was a police car. The lights were not on and no sirens
> could be heard. The car traveled into the neighborhood
> where adults and children were trick-or-treating.
> (ECF 19- 34.)

124.    According to the statement written by Officer Steven Steckel:

> On Friday October 31, 2014 Halloween night, I Officer
> Steven Steckel was off duty and taking my daughter door to
> door trick or treating in the Wilden Acres. My brother Robert
> Steckel was also walking with us. On this date at
> approximately 1935 hrs., we were walking east on Greenway
> St. approaching Whitney Ave. and heard a vehicle
> accelerating while turning right onto Greenway St. from
> Whitehall Ave. There was a group of people walking their
> children on Greenway St. I heard a male voice yelling "slow
> down" the vehicle stopped then backed up, at that point my
> brother and I grabbed my daughter at the same time to pull
> her behind us, unknown what was happening. The male said
> he was sorry to the driver. I didn't know it was the police. I
> then observed the Police vehicle not a SUV but a car
> continue accelerating west on Greenway St. then turned left
> onto Whitney Ave. heading towards West Wilden Dr. the
> Police car then turned right onto west Wilden Dr. While this
> was going on we heard fire truck sirens in the distance,
> unknown if the emergency was in Wilden Acres. The Police
> car didn't have emergency lights or siren on. During this time

the streets were very crowded with families most [sic]children in dark clothing or costumes. The streets in Wilden Acres are very narrow with cars parked on both sides of the street and also leaves are piled along the sides. The lighting in this area is poor due to very few street lights. I contacted County 911 dispatcher to find out who was working and if there were any calls in Wilden Acres. The dispatcher stated there were no calls in the area. I was advised that Sgt. Smith was in charge of the shift, so I contacted him through a text. I quote: "I don't know who is driving a car tonight, but they were driving entirely too fast through Wilden Acres about 15 minutes ago getting yelled at by people walking their kids around door to door it was a car, not an SUV." Sgt. Smith asked I knew who was driving the car. I replied no I just saw the car people and were screaming as it was flying around corner. (ECF 19- 35.)

125.    Plaintiff testified that he did not use his lights or siren because there were trick or treaters walking around. (ECF 19-2, p. 266.) Plaintiff testified that he was not speeding and that he knows he was travelling at less than 15 miles per hour or less in a 25 mile per hour zone. (ECF 19-2, p. 267.) He also testified that the "trick or treaters" were a car width away from the path of his vehicle. (ECF 19-2, p. 332-333.)

126.    Plaintiff testified that he was responding to a 911 call and that he was driving through a residential neighborhood where children were trick-or-treating, but that he didn't turn on his lights and sirens. (ECF 19-2, pp. 265-266.)

127.    Plaintiff testified that he was not in a hurry to get to that 911 call. (ECF 19-2, p. 338.)

128. Plaintiff admitted that he was in that neighborhood because he was "very lost." (ECF 19-2, p. 267.)

129. Plaintiff admits that the complaints about his driving on Halloween came less than two (2) months after he had been counseled by Lieutenant Smith about excessive speed. (ECF 19-2, p. 273.)

130. After receiving the text from Officer Steckel, Sergeant Timothy Smith contacted Plaintiff on Halloween night to ask him to meet at Fairview Park. (ECF 19-2, p. 269.) When they met, the following exchange took place:

> Smith: Somebody made a complaint about you driving too fast through the street while they were trick or treating.
>
> Plaintiff: Okay.
>
> Smith: You know how fast were you going?
>
> Plaintiff: I was not going fast. I know how I was going. And I was paying attention to the kids and everybody that was trick or treating. So I was going through there.
>
> Smith: Well, you know . . . You know, I am fucking tired of this shit. I already called Lieutenant Smith, and I cannot fucking talk to you anymore.

> (ECF 19-2, p. 270.)

131. On November 3, 2014, Plaintiff met with Chief Palmer, Lieutenant Wayne Smith, Sergeant Vangelo, and Township Manager Christman. (ECF 19-2, p. 274.)

132.    Plaintiff testified that at that meeting, Chief Palmer stated, "Well, the

reason why we are here is because I have a complaint. I have a complaint that

you were speeding during Halloween through the township at nighttime when

there were many kids trick or treating. And for me, it's unacceptable that you

were speeding through the zone and, for that reason, I decided not to retain

you as a police officer." (ECF 19- 2, pp. 274-275.)

133.    Chief Palmer testified about the reasons he decided not to retain Plaintiff.

> Well, first of all, it would have been the body of Martin's
> work, how he progressed throughout that year, or 11 months
> or so, and at that point, obviously - and it is a very difficult
> decision, but I have to take the name out, regardless of how
> much I like the guy or know the guy, and I did like Martin
> very much. And he was a good family guy and I knew his
> kids, so it was tough, but I have to take the name out of it,
> the personalities out of it and I looked at the body or work
> and, quite frankly, the driving was the main factor. And I
> have to point back to something that I think of often in
> making these decisions is the little Daviay, the four-year-old
> in Allentown that got hit by the Allentown police officer and
> was killed - crushed in the car and Allentown got sued and I
> think they paid out 6k that - 600k because the guy had a bad
> driving record and there were issues with his driving when
> he was on the job and that weighed very heavily on my
> decision, that I owed it to the residents, citizens and fellow
> officers that I just couldn't risk that. There were other issues
> too, but that was the major (ECF 19-30, p. 68.)

134.    Chief Palmer testified that the other issues included failing to accept

criticism and failing to follow directions and especially report writing.

135.    Chief Palmer testified that he thought, with some additional training,

Plaintiff could have gotten past his ongoing problems with writing reports.

(ECF 19-30, p. 69.)

136.    However, Chief Palmer made the recommendation to Christman that Plaintiff not be retained. (ECF 19-30, p. 63.)

137.    By letter dated November 4, 2014, Plaintiff was notified by Christman that he was not being retained past his probationary period. The letter advised that "[a]fter several re-trainings in a variety of areas, I concur with Chief Palmer's opinion that you have not satisfactorily completed the necessary training to safely perform the duties of your position." (ECF 19-36.)

138.    Plaintiff testified that, during his employment at Palmer Township, he never told any ranking officer that he thought anything Sergeant Smith was doing to him was related to his race or national origin. (ECF 19-2, pp. 277-278; 281.) He did testify that he told three members of his platoon that he believed Sergeant Smith was discriminating against him because of his race. (ECF 19-2, p. 277-278.)

139.    Plaintiff testified that he believed his termination was related to his race, "Because the way [Sgt. Smith] was treating me, it was portrayed that way down. And I would say that they did not do their due diligence to investigate what he was doing to me; meanwhile, [I] already file the complaint against him with the chief and the other one the way he was treating me." (ECF 19-2, p. 281.)

140.    Plaintiff testified that Sergeant Smith never used any racial epithets towards Plaintiff.  (ECF 19-2, p. 142,)

141. Plaintiff testified that other than the two or three time he made fun of Plaintiff's accent, Sergeant Smith never made any comments about Plaintiff's race or national origin. (ECF 19-2, pp. 142-143.)

142. Plaintiff testified that no one at Palmer Township ever made any negative comments to Plaintiff about his race or national origin. (ECF 19-2, p. 143.)

143. Plaintiff does not contend that Chief Palmer or Sergeant Vangelo discriminated against him at all during his employment at Palmer Township. (ECF 19-2, 240.)

144. Sergeant Smith testified that he lacked the authority to discipline Plaintiff. (ECF 19-39, p. 46.)

145. Sergeant Smith was not consulted with regard to the decision not to retain Plaintiff. (ECF 19-39, p. 139.)

146. In Plaintiff's 2015 annual Performance Evaluation with the Lehigh County Sheriff's Office, it was noted, "Deputy Ramirez needs to improve on his report writing skills." (ECF 19-40.)

147. Palmer Township maintains a strict anti-discrimination policy. (ECF 19-41.)

148. Pursuant to that policy:

> A. Palmer Township is an equal opportunity employer and shall comply with all applicable rules and regulations of the Federal and State Government.
> B. It is the policy of Palmer Township to ensure and provide equal opportunity for all persons employed by, or seeking employment with the township, without regard to race, age, color, religion, sex, marital status, national origin, citizenship, handicap, or status as a disabled veteran. This policy extends to the employment relationship and all areas of personnel activity such as selection, job assignment,

supervision, training, promotions, job grading, transfers, terminations, compensation, benefits, educational opportunities, recreational activities, and facilities. The township recognizes its obligations to promote actively such opportunity for all qualified persons and necessary action to ensure that these objectives are met.

C. Any form of harassment because of a person's race, color, religion, citizenship, age, sex, national origin, veteran status or disability is strictly prohibited by the township and by law. Offensive or derogatory comments based on race, color, religion, citizenship, age, sex, national origin, veteran status or disability will not be tolerated. (ECF 19-41, p. 4.)

149.  Palmer Township also maintains a strict anti-harassment policy.

      (ECF 19-41, p. 5.)

150.  Pursuant to that policy:

      Unlawful harassment is unacceptable conduct and will not be tolerated by Palmer Township. This policy applies to and is aimed at preventing any and all unlawful harassment, including harassment by supervisors towards employees; harassment between co-workers; and harassment by non-employees in the workplace, including customers, clients, suppliers, vendors, and independent contractors. All individuals are required to be familiar with and act in accordance with all provisions of this policy. (ECF 19-41, p. 5.)

151.  That policy also includes a procedure by which an employee can complain about harassment or discrimination:

      Any employee who feels that he or she has been subjected to unlawful harassment is required to report this conduct immediately to the township manager or any department head.

      The Township will investigate all allegations of unlawful harassment in a thorough and prompt manner and will take appropriate corrective action when warranted. No one who is personally involved in the alleged harassment shall conduct the investigation. The alleged harasser will be interviewed. Any and all witnesses will be interviewed. Any and all

relevant documents shall be located and reviewed. (ECF 19-41, p. 7.)

152.    When he was hired, Plaintiff signed an acknowledgement that he had received and "carefully read" the Palmer Township Manual. (ECF 19-42.)

## DISCUSSION

The Court's inquiry with regard to Plaintiff's claims under Title VII, the PHRA and 42 U.S.C. § 1981 is governed by the three-step burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to assess whether Plaintiff has adduced indirect evidence of discrimination. *See Weston v. Pennsylvania*, 250 F. 3d 420, 425 n.3 (3d Cir. 2001); *Stewart v. Rutgers, the State University*, 120 F. 3d 426, 432 (3d Cir. 1997). Under the *McDonnell Douglas* framework, Plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* If Plaintiff meets this initial burden, defendants can rebut by providing a legitimate, nondiscriminatory reason for their actions. *Id.* If defendants meet their burden of production, Plaintiff has an opportunity to persuade the trier of fact by a preponderance of the evidence that defendants' proffered legitimate reason was a mere pretext concealing discrimination. *Id.* The court must decide as a matter of law whether plaintiff has established a *prima facie* case. *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003) (per curiam**).**

To establish a prima facie case of discrimination, Plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action despite being qualified; and (4) under circumstances giving rise to an inference of discrimination. Id. (citing *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802 (1973); see also *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).

Even assuming, *arguendo*, Plaintiff has satisfied the first three elements, Plaintiff cannot meet the final element of the *prima facie* case, because he has failed to produce sufficient evidence from which a factfinder could reasonably conclude that he was not retained under circumstances giving rise to an inference of discrimination. "The evidence most often used to establish this nexus is that of disparate treatment, whereby a plaintiff shows that she was treated less favorably than similarly situated employees who are not in plaintiff's protected class." *Doe v. C.A.R.S. Protection Plus, Inc.,* 527 F.3d 358, 365 (3d Cir. 2008).

Plaintiff has not identified a similarly situated employee who is not in Plaintiff's protected class. Although Officer Watt, a Caucasian, was hired as a Probationary Police Officer around the same time as Plaintiff,  Officer Watt had eight to ten years of experience a a police officer in another state, and, therefore, is not similarly situated to Plaintiff. In addition, defendants hired Plaintiff knowing he was Hispanic and Chief Palmer and other others actually thought Plaintiff would be an asset because he was bilingual. There is no evidence that the defendants' work environment was hostile towards minorities. Most significantly, Plaintiff himself testified that: 1) nobody discriminated against him during his field training; 2) he did not believe anyone discriminated against him prior to receiving the written warning; 3) the filing of the administrative charges against him by Sergeant Timothy Smith were not the result of discrimination; 4) he did not tell any ranking officer that he felt he was the victim of

discrimination and 5) he made no reference about any discrimination in his proposed letter of resignation.

The only evidence Plaintiff offers regarding any possible type of discriminatory behavior, is that Sergeant Smith mocked his accent on two or three different occasions. However, "[s]tray remarks by non-decision makers or by decision makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Pivirotto*, 191 F.3d at 359 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)). Though "crude and unprofessional" comments may be offensive, they are insufficient, without more, to create an inference of discrimination. *Id.* (quoting *Ezold*, 983 F.2d at 545-47).

However, even if the foregoing stray bits of evidence were thought to establish a *prima facie* case of discrimination on the basis of race and/or national origin, defendants have satisfied their burden of providing a legitimate, non-discriminatory reason for not retaining him. In making his recommendation not to retain Plaintiff once his probationary period expired, Chief Palmer testified that he relied on actual video of Plaintiff speeding and running a red light and stop signs, as well as written complaints from Officer Steckel and his brother that Plaintiff was speeding through a residential neighborhood on Halloween in the presence of trick or treaters. Because a reasonable factfinder could find that defendants have advanced a legitimate, nondiscriminatory reason for plaintiff's discharge, it therefore falls to Plaintiff to present evidence sufficient to allow a reasonable factfinder to find by a preponderance of the evidence that defendants' reasons were mere pretext, and that discrimination of some sort was the true reason for Plaintiff's termination. *Fasold v. Justice*, 409 F.3d 178, 185 (3d Cir. 2005). Plaintiff's

evidence must be sufficient to provide a factfinder with reasonable grounds for concluding "both that the reason [defendants offered] was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis omitted).

Under the two-prong analysis established by *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994), Plaintiff may establish pretext, and defeat summary judgment, by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons[ ] or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764; see also *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067-72 (3d Cir. 1996) (en banc) (reaffirming Fuentes standard).

To satisfy the first prong, "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997); accord *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 412- 13 (3d Cir. 1999). A plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was "so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109.

A plaintiff may also use the second prong of the *Fuentes/Sheridan* paradigm and point to evidence in the record which "allows the factfinder to infer that discrimination

was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764.

Plaintiff attempts to portray the verbal and written warnings he received regarding his performance and his conduct as an elaborate setup by Sergeant Smith designed to discredit him because of his race and national origin.  However, Plaintiff himself has admitted that he deserved the written and verbal warnings he received for his actions at the firing range, that he had difficulty writing police reports, that he failed to prepare proper crash reports to the District Attorney's office, that he failed to call for backup or even call in the report of a man in a Mercedes with a gun and that he drove too fast to the call at McDonald's.  Although Plaintiff disputed that he was driving too fast in the residential neighborhood on Halloween, Chief Palmer and the Court witnessed Plaintiff speeding in the videos and Officer Steckel and his brother witnessed plaintiff speeding through the residential neighborhood. There is no evidence in the record that either Chief Palmer or Officer Steckel bore any racial animus to Plaintiff. There is nothing implausible or inconsistent about defendants' course of action in failing to retain Plaintiff because of his numerous transgressions during his probationary period and because his driving presented a danger to the community. Plaintiff had been cited by Officer Santo as far back as Plaintiff's Field Training for driving too fast. The Halloween incident occurred just two months after Plaintiff had been counseled by Lieutenant Smith for driving too fast. A reasonable factfinder could not conclude that Plaintiff has satisfied his burden of persuasion under the first *Fuentes* prong to show that defendants' reasons for his termination should not be believed.

Moreover, even if it were true that the warnings and misconducts that Plaintiff received were the result of some form of setup, Plaintiff has completely failed to identify any evidence that any alleged setup was based on his race and/or national origin.

Plaintiff also cannot meet the second prong of the *Fuentes* standard. As discussed above in the context of Plaintiff's *prima facie* case, the only pieces of evidence Plaintiff offers are that Sergeant Smith mocked his accent on two or three occasions and his own opinion that Sergeant Smith resented him because of his race and national origin. Furthermore, Sergeant Smith was not the decision maker in this case.  It was Chief Palmer and Township Manager Christman.  This evidence is not sufficient to permit a reasonable factfinder to infer that discrimination was more likely than not a motivating cause of his termination. The record contains no evidence that anything other than Plaintiff's driving and myriad of other performance problems during his probationary period motivated his termination recommendation by Chief Palmer.

Plaintiff nevertheless argues that Chief Palmer was influenced by the alleged racial animus of Sergeant Smith towards Plaintiff in making his decision not to retain Plaintiff and therefore Palmer Township should be liable under a "cat's paw" theory of liability.  "Cat's paw liability applies when a member of a protected class is subjected to an adverse employment action by a decisionmaker who is himself free of discriminatory animus, but whose actions are influenced by other employees who are motivated by discriminatory animus." *Burlington v. News Corporation*, 55 F. Supp. 3d 723, 731 (E.D. Pa. 2014); *See also McKenna v. City of Philadelphia*, 649 F. 2d 171 (3d Cir. 2011). There is no evidence in the record to support this theory. Chief Palmer's decision to terminate Plaintiff was based in large part on Plaintiff's driving record and the other

reports he had received. Sergeant Smith did not communicate with Chief Palmer about Plaintiff's driving record and poor report writing. Rather, it was Chief Palmer himself who viewed two videos of Plaintiff speeding and running stop signs and a red light. Sergeant Smith also did not accuse plaintiff of driving too fast on Halloween. Rather, it was Officer Steckel and his brother who filed a complaint against Plaintiff at the suggestion of Lieutenant Smith. There is no evidence in the record that nay of these individuals bore any racial animus to Plaintiff. With regard to the incidents at the firing range, which resulted in the written and verbal warnings, Plaintiff admitted to almost all of the charges and even testified the filing of the administrative charges against him by Sergeant Smith were not the result of discrimination. Therefore, those incidents clearly happened and were not "drummed up" by Sergeant Smith.  The incident about the improper crash reports had nothing to do with Sergeant Smith, but was reported by Sergeant Sipel and the incident involving the packages for the District Attorney's Office was reported by Sergeant Ruoff. Accordingly, Plaintiff's discriminatory discharge claims can not survive summary judgment.

Plaintiff's retaliation claim is analyzed under the same *McDonnell Douglas* burden-shifting scheme as his discrimination claims. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997). To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) he engaged in protected activity; (2) he suffered an adverse employment action either after or contemporaneously with the protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action. *Id.*

Defendants contend that Plaintiff has not met his *prima facie* burden because he has failed to establish that he engaged in any protected activity or that he suffered an adverse employment action for having done so. This Court agrees.

An employee engages in a protected activity if he either opposes an unlawful employment practice or files a charge, testifies, assists, or participates in any manner in an agency investigation regarding an allegedly discriminatory employment action. 29 U.S.C. § 623(d); 42 U.S.C. 2003e-3(a); 43 P.C.S. § 955(d). Here, there is simply no evidence from which a reasonable factfinder could conclude that Plaintiff engaged in a protected activity that led to an adverse employment action.  Therefore, Plaintiff's retaliation claims cannot survive summary judgment.

Plaintiff also alleges a racially hostile work environment.  A plaintiff may bring a claim for harassment when a "work environment [is] abusive to employees because of their race, gender, religion, or national origin." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993); *West v. Philadelphia Electric Co.*, 45 F.3d 744, 753 (3d Cir. 1995). To bring an actionable claim for harassment, a plaintiff must establish (1) that he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was severe and pervasive and detrimentally affected him; (3) the discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and (4) the existence of respondeat superior liability. *Jacobs v. City of Philadelphia*, 212 F. App'x 68, 70 (3rd Cir. 2006) (citing *West*, 45 F.3d at 753). A factfinder considers numerous factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance." *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (quoting Harris, 510 U.S. at 23).

Here, Plaintiff alleges that Sergeant Smith mocked his accent on two or three occasions. He also claims that he was often yelled at and humiliated by Sergeant Smith. Plaintiff does not point to any racially discriminatory comments made by any of the other defendants. In fact, he admitted there were none. Nor is there any evidence that any Palmer Township official took actions against Plaintiff that were physically threatening, frequent or that interfered with Plaintiff's ability to perform his job. In addition, Plaintiff admitted that he did not report any claims of harassment or discrimination to any ranking officer. A reasonable factfinder simply could not find that the mocking of his accent on two or three occasions by Sergeant Smith constituted intentional discrimination and was severe and pervasive. While Plaintiff may have had a poor relationship with Sergeant Smith, a poor working relationship with a supervisor is not enough state a claim for racial harassment. *See Walton v. Mental Health Association of Southeastern Pennsylvania*, 168 F. 3d 661, 667 (3d Cir. 1999).

Plaintiff has also asserted a claim against defendant Palmer Township under Title VII for negligence. Plaintiff claims that Palmer Township was negligent in, *inter alia*, failing to implement an effective policy against racial and national origin discrimination and harassment and in failing to properly investigate Plaintiff's complaints of racial and national origin discrimination. The record reveals that Palmer Township had multiple anti-discrimination and harassment policies in place. Plaintiff also acknowledged that he "carefully read" the Manual which contained these policies. Yet, Plaintiff admitted that he never complained to any ranking official in Palmer Township

about being the victim of discrimination and harassment based on race and national origin. It is not possible for Palmer Township to investigate something about which no official has been informed about in the first place. While Plaintiff testified that he complained to Chief Palmer about harassment from Sergeant Smith, Plaintiff admitted that he did not complain about harassment based on *race and national origin*. In any event, Chief Palmer responded to the allegations of harassment by trying to shift Plaintiff to another platoon, albeit without success.

Plaintiff has also brought a claim under 42 U.S.C. §1983, claiming the defendants terminated him without due process of law and that Palmer Township maintained a policy, practice or procedure that was designed to allow his termination without due process of law.

"Probationary police officers have neither a property interest in their employment, nor an absolute right to a pre- or post-termination hearing." *Bartal v. Borough of Laureldale*, 515 F.Supp. 2d 556, 562 (E.D. Pa. 2007). As stated by the Commonwealth Court of Pennsylvania, "The very notion of probationary employment sets those employees apart from the others, signaling that they are new, newly transferred or newly promoted and that they must prove themselves in the new position before being considered permanently employed therein.... Implicit in the term probationary is that the employee is being tested or evaluated on the job." *Olson v. Borough of Avalon*, 811 A.2d 66, 71 (Pa. Commw. 2002) (citing *Upper Makefield Township v. Pennsylvania Labor Relations Board*, 562 Pa. 113, 117-118, 753 A.2d 803, 806 (2000) (Internal citations omitted.)) Indeed, Pennsylvania courts have clearly held that if a police officer is terminated during the probationary period, even on the last day of the period, the

police officer has failed to secure a property interest. *Olson, supra; Whyte v. City of Scranton,* 55 Pa.Commw. 353, 358, 423 A.2d 473, 475 (1980).

Here, Plaintiff was notified that he would not be retained on November 4, 2014, approximately one week before his probationary period ended. As a result, the Court concludes that Plaintiff did not have a property interest in his employment and, therefore had no right to any type of pre or post deprivation hearing. It follows, that since Plaintiff did not have a property interest in his continued employment, Palmer Township could not have had a policy in place that was designed to allow Plaintiff's termination without due process of law. Therefore, defendants are entitled to summary judgment on Plaintiff's claim under 42 U.S.C. § 1983.

Finally, defendants Chief Palmer, Sergeant Smith and Sergeant Vangelo are entitled to summary judgment on Plaintiff's aiding and abetting claims under the Pennsylvania Human Relations Act.

Section 955(e) of the PHRA states that it is an unlawful discriminatory practice "[f]or any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." 43 Pa. Cons. Stat. § 955(e) (emphasis added). Our Court of Appeals has held that individuals can held liable for claims for aiding and abetting brought under the PHRA. See Dici v. Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996).

Because Plaintiff has failed to demonstrate the occurrence of any discrimination against him by Palmer Township, the individual defendants are entitled to summary judgment. One cannot aid and abet that which is not illegal in the first place. *See Scott v. Sunoco Logistics Partners, LP*, 918 F.Supp. 2d 344, 357 n.5 (E.D. Pa. 2013).